Filed 8/26/25  P. v. Perez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B336549 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. VA086169 |
| v. | |
| RAYMOND JOSE PEREZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra Cole-Hall, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, and Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General for Plaintiff and Respondent.

_____

In July 2006, a jury convicted Raymond Perez of attempted murder and shooting at an occupied vehicle. We affirmed Perez's convictions. (*People v. Perez* (Feb. 13, 2008, B196459) [nonpub. opn.] (*Perez I*).)

The Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437). Perez petitioned for resentencing under Penal Code section 1172.6. After an evidentiary hearing, the trial court denied Perez's petition.

Citing *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), Perez argues on appeal that the court considered inadmissible gang expert testimony in finding he had the requisite mental state to aid and abet an attempted murder.

We affirm. Statutory citations are to the Penal Code.

I

We sketch facts.

On November 3, 2004, Luis Zamora was driving home along Maie Avenue near 83rd Street in the late afternoon. He saw two young men on the sidewalk; one was wearing a hooded sweatshirt, and the other was on a bicycle. He recognized one of the men as Perez, whom he had seen around the neighborhood before on at least two occasions. Perez and the other young man moved in front of Zamora's car and gestured with their hands. Perez made gang signs at Zamora. Zamora believed this meant they wanted to fight with him.

2

Zamora heard gunshots and felt pain.  His next memory was waking up at a rehabilitation center months later with staples in his head.

J.A. was visiting family members living near Maie Avenue and 83rd Street on the day of the shooting.  J.A.'s family lived next to Ricky Gonzalez, whom she believed to be a Florencia gang member.

J.A. saw six or seven men hanging out by Gonzalez's house that day.  The group migrated to the corner of 83rd and Maie.  Then, two or three men in the group separated from the group.

J.A. saw Zamora's car drive by and heard three or four gunshots.  She turned toward the direction of the shots and saw one of the men on a bicycle with his hands extended.  She saw the car moving towards 84th Street and heard a crash.  Then she saw the two men who had separated from the group rush back towards Gonzalez's house.

J.A. later identified Perez as one of the men who had separated from the group.  She knew him only as "Boxer."  She had spoken to him a few times.  He once asked her out.  She did not remember the "Boxer" nickname at first, but after a couple days passed, she told Detective Frank Bravo.

Bravo, an experienced deputy sheriff, investigated the shooting.  One of the first people he interviewed was J.A.  When J.A. said "Boxer" had been at the shooting, Bravo used law enforcement software to identify Perez, who was the only gang member in that area using the name "Boxer."

Bravo arrested Perez.  He read Perez his *Miranda* rights (*Miranda v. Ariz.* (1966) 384 U.S. 436), and Perez said he understood those rights.

Perez told Bravo he was an active member of the Florencia Little Rascals.

When Bravo asked, Perez confirmed he had heard about Zamora's shooting, but initially denied being present. Perez later admitted he was present at the shooting, but denied being the shooter. Perez said Carlos Nava, who joined him in confronting Zamora, was the shooter.

Perez told Bravo that, when he saw Zamora, he believed Zamora was a rival gang member who had flipped him off. According to Perez, Nava then pulled a gun from his waistband and fired shots at Zamora's car. After Nava fired the shots, Perez went back to Gonzalez's house.

Detective Hector Velasquez encountered Perez on several occasions before November 2004, and said they had "good rapport." When Velasquez heard that Bravo had arrested Perez, Velasquez came to speak with Perez. Velasquez wanted to ask Perez about the circumstances of Zamora's shooting.

Velasquez read Perez his *Miranda* rights (*Miranda, supra,* 384 U.S. 436) and Perez told Velasquez that he wanted to talk about the shooting. Velasquez recorded his conversation with Perez.

During this conversation, Perez told Velasquez that on the day of Zamora's shooting, there was a "big group of guys" on Maie Avenue that he was "kicking it" with. Velasquez asked Perez whether it was normal for someone in the group to have a weapon to defend themselves against a rival gang coming into the neighborhood, and Perez responded: "possibly."

When Zamora drove up, Perez believed Zamora "was just acting too suspicious" and said of Zamora: "[l]ittle fuck dissing me." Perez responded by throwing a Florencia gang sign in

4

Zamora's direction. According to Perez, Zamora then said: "fuck you–all fools," which Perez interpreted as meaning Zamora "was just up to no good."

Perez heard gunshots and biked away.

An August 2005 information charged Perez and Nava as follows: in Count One, Nava and Perez unlawfully and with malice aforethought attempted to murder Zamora, in violation of section 664 and section 187, subsection (a); in Count Two, Nava and Perez willfully, unlawfully, and maliciously shot a gun at an occupied motor vehicle, in violation of section 246. The information also included allegations for a gang enhancement under section 186.22, subsection (b)(1)(A) and a gun enhancement under section 12022.53, subsections (d) and (e)(1).

Perez and Nava were tried separately.

At Perez's July 2006 trial, the prosecutor set forth two theories of liability for Perez: either Perez knew about Nava's gun and intended to aid him in attempting to murder Zamora, or Perez did not know about Nava's gun, but intended to commit an assault or breach of the peace by running up to Zamora, and Nava shooting Zamora was a natural and probable consequence of the target crime. The court instructed the jury on both theories.

During the prosecutor's case in chief, the jury heard testimony from Zamora, J.A., Bravo, and other law enforcement officers. The jury also heard the recorded conversation between Perez and Velasquez, which Velasquez duly authenticated.

Next, the prosecutor called Velasquez as an expert witness on the Florencia gang. Velasquez had been with the police department for eighteen years and had investigated gang crimes for over nine years by the time of the trial. He had interviewed

5

over 1,000 gang members, undergone several training sessions, taught a class on gangs, and testified as a gang expert in court over twenty times.

Velasquez first encountered the Florencia gang in 1990. He had spoken to many Florencia gang members while on patrol and was part of a task force that specifically dealt with Florencia gang members and their rivals.

Velasquez testified that the Florencia gang is divided into 25 cliques. The Florencia clique that claims the area around Maie Avenue is the Little Rascals.

While on patrol, Velasquez tried to figure out which gang members were "putting in work." Velasquez testified that "putting in work" as a gang member meant showing one's value to the gang, and to do so, a member would "go out and commit criminal acts that will benefit the gang." These acts could include graffiti, beating up a rival gang member, and shooting; "whatever it takes to let them know you're part of this gang." "Putting in work" would result in the gang member gaining respect in the gang.

According to Velasquez, when a group of Florencia gang members hangs out at a certain area, they are "claiming that particular area as theirs. This is our turf." Florencia gang members would be wary of unknown cars entering their turf. If this were to happen, one to three gang members would "challenge" the person in the unknown car by throwing gang signs, while the rest of the gang members would stay back and watch. The gang members doing the "challenge" would arm themselves before confronting strangers and were prepared to inflict violence if they perceived the strangers as rivals. Velasquez explained the gang members had "survival skills" to

6

defend themselves against rival gang members who would dare invade their territory.

The prosecutor then described a hypothetical scenario: if an unknown potential rival gang member drove by, and two or three gang members ran up to the car, one of them throwing gang signs, and the other shooting the driver, would the gang members have done this to benefit the gang?

Velasquez responded: "Oh yes, definitely. Based on my training and experience and the numerous investigations I've conducted and interviews I've had with actual gang members, a group separating itself from the main group is simply acting as one.

"So that the group that stayed back can watch and say look at [what] one, two, or three guys are doing.

"Those three guys are really crazy. Those three guys are putting in the work for our neighborhood. They're loyal to us.

"In return, the one, two, or three guys that actually separated from the group to go conduct this act of violence, their reputation, respect, would just grow by the number of individuals in that group that's watching.

"So do they benefit the three individuals committing the act? The one throwing the hand signs, the one doing the shooting, similarly the one standing there looking around making sure no police come, making sure the witnesses, who's looking so they can contact them later, those three individuals within that clique within that gang group — their status elevates."

Velasquez testified the act of shooting a rival gang member would benefit the gang. The neighborhood would hear about it, which would bolster the gang's reputation.

7

The jury found Perez guilty on both counts. It also found true the allegations that Perez had committed the crimes for the benefit of a criminal street gang under section 186.22, subsection (b)(1)(A), and that a principal personally and intentionally discharged a handgun causing great bodily harm to Zamora, under section 12022.53, subsections (d) and (e)(1).

The trial court sentenced Perez on Count One to life imprisonment with the possibility of parole, plus 25 years to life for the gun enhancement. The terms were consecutive. The court stayed Count Two under section 654.

Perez appealed the judgment, arguing the court committed prejudicial error by instructing the jury on aiding and abetting an attempted murder because there was insufficient evidence to support either of the prosecutor's theories of aiding and abetting. (*Perez I*, *supra*.)

The appellate court rejected this argument and affirmed because the evidence supported a reasonable inference that Perez was liable as an aider and abettor "either because he knew about Nava's gun and intended that a shooting would occur, or because he intended at least an assault or breach of the peace by stopping Zamora's car and challenging him to get out of the car and fight, and the shooting was a natural and probable consequence of the crime he intended." (*Perez I*, *supra*.)

In January 2021, Perez filed a petition for resentencing under section 1170.95 (now 1172.6).

Because the trial court had instructed the jury on the natural and probable consequences theory of liability, the parties stipulated that Perez had made a prima facie showing for relief and asked the court to issue an order to show cause and set an evidentiary hearing. The court obliged.

Neither party presented live testimony at the evidentiary hearing; rather, both premised their arguments on the evidence at Perez's July 2006 trial. The main issue at the hearing was what portions of Velasquez's gang expert testimony were admissible under *Sanchez* and *Crawford*.

At the hearing, the court largely overruled Perez's objections to Velasquez's testimony. Relying on Velasquez's testimony, the court found Nava and Perez were "working together as a team at that point," with Perez as the "instigator of that interaction." The court noted that when Perez flashed the gang signs to a perceived rival gang member, "it is reasonable to believe, that, in fact, when they interacted with the individual in the car, their intention was, in fact, to kill him." Based on the facts, the court found the prosecutor had proved beyond a reasonable doubt that Perez was guilty of attempted murder as a direct aider and abettor to Nava and denied his petition.

II

We review a trial court's findings at a section 1172.6 evidentiary hearing for substantial evidence: "evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 [internal citation omitted].) In doing so, we accept the trial court's determinations on witness credibility and evidentiary conflicts, along with any logical inferences it may have drawn from the evidence. (*People v. Didyavong* (2023) 90 Cal.App.5th 85, 97.) We will not reverse the trial court unless there is no hypothesis upon which sufficient substantial evidence exists to support its decision. (*Ibid.*)

After the passage of Senate Bill 1437 and Senate Bill No. 775 (2021-2022 Reg. Sess., effective January 1, 2022) (Senate Bill 775), resentencing relief became available to defendants with attempted murder convictions who never had the intent to kill. (See *People v. Rodriguez* (2024) 103 Cal.App.5th 451, 456–457 (*Rodriguez*).)  Senate Bill 1437 "eliminated natural and probable consequences liability for murder as it applies to aiding and abetting" and created a procedural mechanism—section 1172.6 (formerly 1170.95)—for defendants to seek retroactive relief. (See *People v. Lewis* (2021) 11 Cal.5th 952, 957.)  Senate Bill 775 "expanded the class of defendants entitled to relief to those convicted of attempted murder under the natural and probable consequences doctrine." (*Rodriguez, supra*, 103 Cal.App.5th at p. 457.)

Nevertheless, a defendant who directly aids and abets an attempted murder is not eligible for relief under section 1172.6. (See *People v. Cortes* (2022) 75 Cal.App.5th 198, 204.)  This is because "outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator."  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)  An aider and abettor's guilt "would be based on the combined actus reus of the participants, but also solely on that person's own mens rea." (*Id.* at p. 1121.)  For attempted murder, the requisite mens rea is intent to kill. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)  The prosecutor bears the burden of proving beyond a reasonable doubt that the defendant remains guilty of attempted murder under California law as amended by the changes from Senate Bill 1437 and Senate Bill 775.  (See § 1172.6, subd. (d)(3).)

On appeal, Perez challenges only the trial court's finding that there was substantial evidence of his intent to kill because, in doing so, the trial court admitted inadmissible gang expert testimony from Velasquez in violation of *Sanchez*. He argues: "There is no evidence that [he] even knew Nava had a gun until [Nava] pulled it and started shooting. Throwing a gang sign is not the equivalent of nor does it indicate specific intent to kill such as is required for attempted murder."

This argument fails.

In *Sanchez*, our Supreme Court considered the degree to which a defendant's rights under the Sixth Amendment's Confrontation Clause that the United States Supreme Court articulated in *Crawford* "limits an expert witness from relating case-specific hearsay content in explaining the basis for his opinion." (*Sanchez*, *supra*, 63 Cal.4th at p. 670.)

Detective David Stow, the prosecution's gang expert in *Sanchez*, testified generally about Delhi gang culture. (*Sanchez*, *supra*, 63 Cal.4th at p. 672.) When the prosecutor asked about the defendant's multiple contacts with the police, Stow gave the details of each encounter. (*Ibid.*) Stow opined that the defendant was a member of the Delhi gang based on records of the defendant's contacts with other police officers and police reports, and that the defendant's conduct (running into an apartment where he had stored a loaded gun and drugs) benefited the Delhi gang because he was willing to risk incarceration by possessing a gun and narcotics on the gang's turf. (*Id.* at p. 673.) However, on cross-examination, Stow admitted he had never met the defendant and his knowledge of the defendant's police contacts was from reading police reports. (*Ibid.*)

11

The *Sanchez* court found Stow's case-specific testimony as to the defendant's police contacts of which he had no personal knowledge but presented as true statements of fact to be inadmissible hearsay. (*Sanchez*, *supra*, 63 Cal.4th at p. 670.) But it also clarified that its holding "does not affect the traditional latitude granted to experts to describe background information and knowledge in the areas of his expertise." (*Id.* at p. 685.) *Sanchez* further noted: "[g]ang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven." (*Ibid.*)

Here, Velasquez did not rely on hearsay that *Sanchez* forbids. Unlike Stow, he had spoken with Perez on several occasions before asking him about Zamora's shooting. He testified generally about Florencia gang culture, and Perez never challenged his qualifications to do so.

Velasquez did give an opinion based on a hypothetical including case-specific facts about Zamora's shooting, but those case-specific facts were properly proven through the testimony of Zamora and J.A.—percipient witnesses to the shooting—and the authenticated recording of the interview between Perez and Velasquez. Velasquez's testimony was proper under *Sanchez*, constituted substantial evidence, and the trial court did not err in relying on it to find Perez had the intent to kill Zamora. (See *Sanchez*, *supra*, 63 Cal.4th at p. 685.) It was reasonable for the court to infer Perez knew Nava had a gun, based on Velasquez's expert opinion that gang members armed themselves before "challenging" potential rivals, and that Perez throwing gang

12

signs at Zamora and believing him to be a rival reflected the intent to kill Zamora.  (See *People v. Johnson* (2016) 62 Cal.4th 600, 630 [a defendant's "substantial participation" in the events before a murder can support an inference that the defendant knew of the plan to kill the victim, intended to facilitate the plan, and aided in the plan].)

## DISPOSITION

We affirm the trial court's order.


WILEY, J.


We concur:


STRATTON, P. J.



VIRAMONTES, J.


13